UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,                             Criminal No. 17-CR-20274

vs.                                      HON. BERNARD A. FRIEDMAN

JUMANA NAGARWALA, et al.,

       Defendants.

_____/

**OPINION AND ORDER**
**GRANTING DEFENDANTS' MOTION TO DISMISS**
**COUNTS ONE THROUGH SIX OF THE THIRD SUPERSEDING INDICTMENT**

        This matter is presently before the Court on defendants' motion to dismiss counts one through six of the third superseding indictment[1] [docket entry 307].  The government has filed a response in opposition, defendants have filed a reply, and the Court has heard oral argument.  For the following reasons, the Court shall grant the motion.

        This case concerns female genital mutilation ("FGM").  There are eight defendants. The government alleges that Dr. Jumana Nagarwala performed the procedure, that Dr. Fakhruddin Attar allowed Dr. Nagarwala to use his clinic in Livonia, Michigan, to perform the procedure, that Farida Attar and Tahera Shafiq assisted Dr. Nagarwala in performing the procedure, and that the

_____

[1] The motion is entitled "motion to dismiss counts one, two, three, four, and five."  When this motion was filed, the operative indictment was the second superseding, and counts one through five thereof charged defendants with committing, conspiring to commit, and aiding and abetting the commission of female genital mutilation in violation of 18 U.S.C. §§ 2, 116, and 371.  After the motion was filed, the grand jury returned a third superseding indictment, and counts one through six thereof likewise charge defendants with committing, conspiring to commit, and aiding and abetting the commission of female genital mutilation in violation of 18 U.S.C. §§ 2, 116, and 371.  Therefore, the Court construes the instant motion as seeking the dismissal of counts one through six of the third superseding indictment.

other defendants (Farida Arif, Fatema Dahodwala, Haseena Halfal, and Zainab Hariyanawala), who are the mothers of the victims, brought their daughters to the clinic for the procedure. The government alleges that four of the victims are residents of Michigan, three are residents of Illinois, and two are residents of Minnesota.

Count one of the third superseding indictment charges all of the defendants with conspiracy to commit FGM, in violation of 18 U.S.C. § 371. Counts two through six charge all of the defendants with committing FGM and with aiding and abetting each other in doing so, in violation of 18 U.S.C. §§ 116[2] and 2. Count seven charges Dr. Nagarwala with "conspiracy to travel

---

[2] Section 116 states:

(a) Except as provided in subsection (b), whoever knowingly circumcises, excises, or infibulates the whole or any part of the labia majora or labia minora or clitoris of another person who has not attained the age of 18 years shall be fined under this title or imprisoned not more than 5 years, or both.

(b) A surgical operation is not a violation of this section if the operation is--

(1) necessary to the health of the person on whom it is performed, and is performed by a person licensed in the place of its performance as a medical practitioner; or

(2) performed on a person in labor or who has just given birth and is performed for medical purposes connected with that labor or birth by a person licensed in the place it is performed as a medical practitioner, midwife, or person in training to become such a practitioner or midwife.

(c) In applying subsection (b)(1), no account shall be taken of the effect on the person on whom the operation is to be performed of any belief on the part of that person, or any other person, that the operation is required as a matter of custom or ritual.

(d) Whoever knowingly transports from the United States and its

2

with intent to engage in illicit sexual conduct," in violation of 18 U.S.C. § 2423(b).  And count eight charges four of the defendants with conspiracy to obstruct an official proceeding, in violation of 18 U.S.C. § 1512(k).

***Defendants' Motion to Dismiss***

Defendants seek dismissal of all of the FGM charges – substantive, conspiracy, and aiding and abetting – on the grounds that Congress lacked authority to enact § 116(a) ("the FGM statute").  Defendants argue that Congress may exercise legislative authority only to the extent allowed by the Constitution, and that the only potentially applicable sources of congressional power – the Necessary and Proper Clause and the Commerce Clause[3] – do not grant it authority to prohibit FGM.  In response, the government argues that each of these clauses independently provided Congress with the authority to enact the statute.  In deciding this motion, the Court is aware that it may invalidate a federal statute "only upon a plain showing that Congress has exceeded its constitutional bounds," *United States v. Morrison*, 529 U.S. 598, 607 (2000), and that "the lack of constitutional authority to pass the act in question [must be] clearly demonstrated." *Nat'l Fed'n of*

---

territories a person in foreign commerce for the purpose of conduct with regard to that person that would be a violation of subsection (a) if the conduct occurred within the United States, or attempts to do so, shall be fined under this title or imprisoned not more than 5 years, or both.

[3] Defendants also argue that Section 5 of the Fourteenth Amendment (which states that "[t]he Congress shall have power to enforce, by appropriate legislation, the provisions of this article") does not empower Congress to prohibit FGM.  Defs.' Br. at 14-20.  In its response brief, the government indicates that it does not rely on the Fourteenth Amendment as a basis for upholding the FGM statute.  Rather, the government argues only that Congress has authority to criminalize FGM based on the Necessary and Proper Clause and the Commerce Clause; the government reserves "the right to assert other grounds in future cases, should the facts and circumstances so merit."  Gov't's Resp. at 15 n.16.

3

*Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012).

### A. *The Necessary and Proper Clause*

Article I, Section 8, Clause 18 of the Constitution grants Congress the power

[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.

The Necessary and Proper Clause is not an independent grant of power, but it permits Congress to legislate to carry out powers enumerated elsewhere in the Constitution. *See United States v. Comstock*, 560 U.S. 126, 134 (2010) (noting that "whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, we look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power").

In the present case, the government argues that the relevant enumerated power resides in Article II, Section 2, Clause 2, which gives the President "Power, by and with the Advice and Consent of the Senate to make Treaties, provided two thirds of the Senators present concur." Congress may pass legislation to effectuate a treaty, *see, e.g., Missouri v. Holland*, 252 U.S. 416 (1920),[4] but only to the extent that the two are rationally related. *See United States v. Lue*, 134 F.3d 79, 84 (2nd Cir. 1998) (citing *McCulloch v. Maryland*, 17 U.S. 316 (1819)). Further, "no agreement with a foreign nation can confer power on the Congress, or on any other branch of Government,

---

[4] The Court notes that two justices expressed their disagreement with this proposition in *United States v. Bond*, 572 U.S. 844, 873-82 (2014) (Scalia and Thomas, JJ., concurring) (criticizing *Holland*'s statement that "[i]f the treaty is valid there can be no dispute about the validity of the statute under Article I, § 8, as a necessary and proper means to execute the powers of the Government" as "unreasoned and citation-less").

which is free from the restraints of the Constitution." *Reid v. Covert*, 354 U.S. 1, 16 (1957).

The treaty on which the government relies in the present case is the International Covenant on Civil and Political Rights ("ICCPR"),[5] which the Senate ratified in 1992. Specifically, the government points to two provisions of this treaty: Article 3, which calls on the signatories to "ensure the equal right of men and women to the enjoyment of all civil and political rights set forth in the present Covenant"; and Article 24, which states that "[e]very child shall have, without any discrimination as to race, colour, sex, language, religion, national or social origin, property or birth, the right to such measures of protection as are required by his status as a minor, on the part of his family, society and the State."[6] The government argues that Congress, by enacting the FGM statute, acted reasonably to carry out these two treaty obligations.

The Court rejects the government's argument for two reasons. First, there is no

---

[5] The first 27 Articles of the ICCPR are substantive provisions; Articles 28-53 deal with reporting and enforcement mechanisms and ratification procedures. The substantive articles cover a wide range of political and civil rights, e.g., the "right of self-determination" (Art. 1), gender equality (Art. 3), the right not to be "subjected to torture or to cruel, inhuman or degrading treatment or punishment" (Art. 7), trial and detention rights (Art. 9 and 14), prohibition of debtors' prison (Art. 11), freedom of movement (Art. 12), prohibition of ex post facto laws (Art. 15), prohibition of "arbitrary or unlawful interference with . . . privacy, family, home or correspondence, [and] unlawful attacks on . . . honour and reputation" (Art. 17), freedom of conscience and expression (Art. 18 and 19), prohibition of war propaganda and hate speech (Art. 20), the right of assembly (Art. 21), "freedom of association with others, including the right to form and join trade unions" (Art. 22), "the right of men and women of marriageable age to marry and to found a family" (Art. 23), the right to "vote and to be elected at genuine periodic elections" (Art. 25), equal protection of the law (Art. 26), and the rights of ethnic, religious, and linguistic minorities (Art. 27).

[6] Article 7 of the ICCPR, which prohibits torture and "cruel, inhuman or degrading treatment or punishment," arguably is more closely related to the FGM statute than is either Article 3 or Article 24. However, the government indicates that "[t]he U.S. has lodged a reservation to Article 7 and does not rely on this article to make its arguments here." Gov't Br. at 19 n.18.

rational relationship between the FGM statute and Article 3, which obligates member states "to ensure the equal right of men and women to the enjoyment of all civil and political rights set forth in the present Covenant." This article seeks to ensure equal civil and political rights (e.g., the freedom of expression, the right to participate in elections, and protections for defendants in criminal proceedings) for men and women, while the FGM statute seeks to protect girls aged seventeen and younger from a particular form of physical abuse. There is simply no rational relationship between Article 3 and the FGM statute. The latter does not effectuate the purposes of the former in any way.

The relationship between the FGM statute and Article 24 is arguably closer. As noted, that article states that "[e]very child shall have, without any discrimination as to race, colour, sex, language, religion, national or social origin, property or birth, the right to such measures of protection as are required by his status as a minor, on the part of his family, society and the State." Still, the relationship between the FGM statute and Article 24 is tenuous. Article 24 is an anti-discrimination provision, which calls for the protection of minors without regard to their race, color, sex, or other characteristics. As laudable as the prohibition of a particular type of abuse of girls may be, it does not logically further the goal of protecting children on a nondiscriminatory basis.

Second, even assuming the treaty and the FGM statute are rationally related, federalism concerns deprive Congress of the power to enact this statute. In adopting the ICCPR, each member state obligated itself to "take the necessary steps, in accordance with its constitutional processes . . . to adopt such laws or other measures as may be necessary to give effect to the rights recognized in the present Covenant." ICCPR Art. 2 ¶ 2. The constitutional processes in the United States include the important – indeed, foundational – division of authority between the states and the federal government, as recognized in the report of the Senate Committee on Foreign Relations,

which recommended that the Senate ratify this treaty subject to various reservations, understandings, and declarations.  One of these understandings was

> [t]hat the United States understands that this Convention shall be implemented by the Federal Government to the extent that it exercises legislative and judicial jurisdiction over the matters covered therein, and otherwise by the state and local governments; to the extent that state and local governments exercise jurisdiction over such matters, the Federal Government shall take measures appropriate to the Federal system to the end that the competent authorities of the state or local governments may take appropriated [sic] measures for the fulfillment of the Convention.

Defs.' Ex. S at 23 (Report of the Senate Committee on Foreign Relations dated Mar. 2, 1992).  This understanding comported with one recommended by the Bush Administration, *see id.* at 9, which offered the following explanation:

> In light of Article 50 ("The provisions of the present Covenant shall extend to all parts of federal States without any limitations or exceptions"), it is appropriate to clarify that, even though the Covenant will apply to state and local authorities, it will be implemented consistent with U.S. concepts of federalism.
>
> *    *    *
>
> The proposed understanding serves to emphasize domestically that there is no intent to alter the constitutional balance of authority between the State and Federal governments or to use the provisions of the Covenant to "federalize" matters now within the competence of the States.

*Id.* at 17-18.

One aspect of this constitutional balance is that the "States possess primary authority for defining and enforcing the criminal law." *Brecht v. Abrahamson*, 507 U.S. 619, 635 (1993).  In the same vein, the Supreme Court has noted that in the area of "criminal law enforcement . . . States historically have been sovereign," *United States v. Lopez*, 514 U.S. 548, 564 (1995), and that "[t]he

Constitution . . . withhold[s] from Congress a plenary police power." *Id.* at 566. In *United States v. Morrison*, 529 U.S. 598, 615, 618 (2000), the Court noted the "Constitution's distinction between national and local authority" and that "[t]he regulation and punishment of intrastate violence . . . has always been the province of the States." Further, "we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *Id.* at 618.

In *Bond v. United States*, 572 U.S. 844 (2014), the Supreme Court commented on the interplay between Congress' authority to implement a treaty and the restraint on that authority imposed by federalism concerns. In that case, defendant was charged with violating the Chemical Weapons Convention Implementation Act, which Congress passed to effectuate the Convention on the Prohibition of the Development, Production, Stockpiling, and Use of Chemical Weapons and on Their Destruction. The Court found it unnecessary to rule on the constitutionality of the statute, as it determined that defendant's use of certain chemicals did not come within the statute's definition of a chemical weapon. Nonetheless, the Court's comments on the federalism issue bear repeating:

> There is no reason to think the sovereign nations that ratified the Convention were interested in anything like Bond's common law assault.
>
> Even if the treaty does reach that far, nothing prevents Congress from implementing the Convention in the same manner it legislates with respect to innumerable other matters–*observing the Constitution's division of responsibility between sovereigns and leaving the prosecution of purely local crimes to the States*. The Convention, after all, is agnostic between enforcement at the state versus federal level: It provides that "[e]ach State Party shall, in accordance with its constitutional processes, adopt the necessary measures to implement its obligations under this Convention." Art. VII(1), 1974 U.N.T.S. 331 (emphasis added); see also Tabassi, National Implementation: Article VII, in Kenyon & Feakes 205, 207 ("Since the creation of national law, the enforcement of it and the structure and

8

administration of government are all sovereign acts reserved exclusively for [State Parties], it is not surprising that the Convention is so vague on the critical matter of national implementation.").

Fortunately, we have no need to interpret the scope of the Convention in this case. Bond was prosecuted under section 229, and the statute–unlike the Convention–must be read consistent with principles of federalism inherent in our constitutional structure.

*   *   *

The Convention provides for implementation by each ratifying nation "in accordance with its constitutional processes." Art. VII(1), 1974 U.N.T.S. 331. As James Madison explained, the constitutional process in our "compound republic" keeps power "divided between two distinct governments." The Federalist No. 51, p. 323 (C. Rossiter ed. 1961). If section 229 reached Bond's conduct, it would mark a dramatic departure from that constitutional structure and a serious reallocation of criminal law enforcement authority between the Federal Government and the States. Absent a clear statement of that purpose, we will not presume Congress to have authorized such a stark intrusion into traditional state authority.

*Id.* at 856, 866 (emphasis added).  Characteristically, Justice Scalia's concurring opinion made the argument somewhat more pointedly:

*Holland* places Congress only one treaty away from acquiring a general police power.

The Necessary and Proper Clause cannot bear such weight. As Chief Justice Marshall said regarding it, no "great substantive and independent power" can be "implied as incidental to other powers, or used as a means of executing them." *McCulloch v. Maryland*, 4 Wheat. 316, 411, 4 L.Ed. 579 (1819); see Baude, Rethinking the Federal Eminent Domain Power, 122 Yale L.J. 1738, 1749–1755 (2013). *No law that flattens the principle of state sovereignty, whether or not "necessary," can be said to be "proper."* As an old, well-known treatise put it, "it would not be a proper or constitutional exercise of the treaty-making power to provide that Congress should have a general legislative authority over a subject which has not been given it by the Constitution." 1 W. Willoughby, The Constitutional Law of the United States § 216, p. 504 (1910).

*Id.* at 879 (Scalia, J., concurring in the judgment) (emphasis added; footnotes omitted).

Application of these principles to the present case leads to the conclusion that Congress overstepped its bounds by legislating to prohibit FGM.  Like the common law assault at issue in *Bond*, FGM is "local criminal activity" which, in keeping with longstanding tradition and our federal system of government, is for the states to regulate, not Congress.  *Id.* at 848.  Therefore, even accepting the government's contention that the criminal punishment of FGM is rationally related to the cited articles of the ICCPR, federalism concerns and the Supreme Court's statements regarding state sovereignty in the area of punishing crime – and the federal government's lack of a general police power – prevent Congress from criminalizing FGM.  "[T]he principle that [t]he Constitution created a Federal Government of limited powers, while reserving a generalized police power to the States is deeply ingrained in our constitutional history." *Morrison*, 529 U.S. at 618 n.8 (internal quotation marks omitted).  The FGM statute cannot be sustained under the Necessary and Proper Clause.

**B. *The Commerce Clause***

The government also argues that the Commerce Clause empowered Congress to criminalize FGM.  Article I, Section 8, Clause 3 of the Constitution grants Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." When Congress' authority to legislate under this Clause is challenged, the test is whether "a rational basis exists" for concluding that the activity being regulated "substantially affect[s] interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 22 (2005).

### 1. *Review of the Case Law*

Many cases have analyzed the issue of congressional power, and its limits, under the Commerce Clause.  Of the many such cases cited by the parties, in chronological order the Court finds those that follow to be the most instructive.

In *Wickard v. Filburn*, 317 U.S. 111 (1942), an Ohio farmer grew more wheat than was permitted under the Agricultural Adjustment Act.  The purpose of the statute "as related to wheat is to control the volume moving in interstate and foreign commerce in order to avoid surpluses and shortages and the consequent abnormally low or high wheat prices and obstructions to commerce." *Id.* at 115.  Filburn was permitted to grow wheat on 11.1 acres, but he did so on 23 acres.  He was fined for the 239 bushels he harvested on the excess acreage.  Instead of paying, Filburn brought suit to enjoin enforcement of this fine, arguing that the statute was unconstitutional because it reached not only wheat that was sold on the open market but also wheat intended "wholly for consumption on the farm," which, he contended, had at most an indirect effect on interstate commerce. *Id.* at 118.

The Supreme Court rejected this argument because even if Filburn consumed the excess wheat himself (e.g., for making flour or feeding his livestock or planting the next crop), his doing so affected the overall wheat market, and this undermined Congress' efforts to stabilize prices and supply, as those efforts depended on accurate predictions about the total wheat production and consumption each year.  "That [Filburn's] own contribution to the demand for wheat may be trivial by itself is not enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial." *Id.* at 127-28.  That is, "even if [Filburn's] activity be local and though it may not be regarded as

commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce." *Id.* at 125.

In *Perez v. United States*, 402 U.S. 146 (1971), defendant was convicted of loan sharking under the Consumer Credit Protection Act. He challenged the statute on Commerce Clause grounds, arguing that "all that is involved in loan sharking is a traditionally local activity." *Id.* at 156-57. The Supreme Court rejected this argument because "[w]here the class of activities is regulated and that class is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class." *Id.* at 154. Further, "[e]xtortionate credit transactions, though purely intrastate, may in the judgment of Congress affect interstate commerce." *Id.* The Court noted the extensive congressional findings showing the "tie-in between local loan sharks and interstate crime." *Id.* at 155. Congress found that "loan sharking [is] the second largest source of revenue for organized crime," that "organized crime takes over $350 million a year from America's poor through loan-sharking alone," and that such money "serve[s] as a source of funds to bookmakers, narcotics dealers, and other racketeers." *Id.* at 155-56. The Court reasoned that based on these findings, Congress could regulate local loan sharking because it is part of "organized interstate crime." *Id.* at 157.

In *United States v. Lopez*, 514 U.S. 548 (1995), defendant brought a gun to his high school. He was convicted of possessing a firearm at a school, in violation of the Gun-Free School Zones Act. The Supreme Court vacated the conviction because Congress lacked authority under the Commerce Clause to enact the statute. The Court began by identifying

> three broad categories of activity that Congress may regulate under its commerce power. First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or

persons or things in interstate commerce, even though the threat may
come only from intrastate activities.  Finally, Congress' commerce
authority includes the power to regulate those activities having a
substantial relation to interstate commerce, i.e., those activities that
substantially affect interstate commerce.

*Id.* at 558-59 (citations omitted).  The Court noted that only the third category applied in that case.

The parties in the present case likewise agree that only the third category applies.  As to this

category, "the proper test requires an analysis of whether the regulated activity 'substantially affects'

interstate commerce."  *Id.* at 559.  "Where economic activity substantially affects interstate

commerce, legislation regulating that activity will be sustained."  *Id.* at 560.

The Court found no merit in the government's explanation as to how possession of

a gun at a school substantially affects interstate commerce:

The Government's essential contention . . . is that we may
determine here that § 922(q) is valid because possession of a firearm
in a local school zone does indeed substantially affect interstate
commerce.  The Government argues that possession of a firearm in
a school zone may result in violent crime and that violent crime can
be expected to affect the functioning of the national economy in two
ways.  First, the costs of violent crime are substantial, and, through
the mechanism of insurance, those costs are spread throughout the
population.   Second, violent crime reduces the willingness of
individuals to travel to areas within the country that are perceived to
be unsafe.  The Government also argues that the presence of guns in
schools poses a substantial threat to the educational process by
threatening the learning environment.  A handicapped educational
process, in turn, will result in a less productive citizenry.  That, in
turn, would have an adverse effect on the Nation's economic
well-being.  As a result, the Government argues that Congress could
rationally have concluded that § 922(q) substantially affects interstate
commerce.

We pause to consider the implications of the Government's
arguments. The Government admits, under its "costs of crime"
reasoning, that Congress could regulate not only all violent crime, but
all activities that might lead to violent crime, regardless of how
tenuously they relate to interstate commerce.  Similarly, under the

13

Government's "national productivity" reasoning, Congress could regulate any activity that it found was related to the economic productivity of individual citizens: family law (including marriage, divorce, and child custody), for example. Under the theories that the Government presents in support of § 922(q), it is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign. Thus, if we were to accept the Government's arguments, we are hard pressed to posit any activity by an individual that Congress is without power to regulate.

*   *   *

To uphold the Government's contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States.

*Id.* at 563-64, 567. Additionally, the Court noted that the statute "by its terms has nothing to do with 'commerce' or any sort of economic enterprise"; that the statute "contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce"; and that it is the states, not the federal government, that have "primary authority for defining and enforcing the criminal law." *Id.* at 561 & n.3.

In *United States v. Morrison*, 529 U.S. 598 (2000), plaintiff alleged that the two defendants raped her when the three were students at Virginia Polytechnic Institute. She sued them under the Violence Against Women Act ("VAWA"), which created a private right of action for victims of "crimes of violence motivated by gender." The district court dismissed the complaint on the grounds that Congress lacked authority, under the Commerce Clause or the Fourteenth Amendment, to enact this statute. The Fourth Circuit affirmed. In affirming the Fourth Circuit, the Supreme Court began by noting the importance of the fact that the VAWA did not regulate economic activity:

14

> *Gender-motivated crimes of violence are not, in any sense of the phrase, economic activity.* While we need not adopt a categorical rule against aggregating the effects of any noneconomic activity in order to decide these cases, *thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature.*

*Id.* at 613 (emphasis added).  As in *Lopez*, the Court rejected the government's explanations as to how violent crime may affect interstate commerce.  The Court quotes this passage at length because the reasoning applies equally to the present case:

> In contrast with the lack of congressional findings that we faced in *Lopez*, [the VAWA] is supported by numerous findings regarding the serious impact that gender-motivated violence has on victims and their families. But the existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation. . . .
>
> In these cases, Congress' findings are substantially weakened by the fact that they rely so heavily on a method of reasoning that we have already rejected as unworkable if we are to maintain the Constitution's enumeration of powers. Congress found that gender-motivated violence affects interstate commerce
>
>> "by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved in interstate commerce; . . . by diminishing national productivity, increasing medical and other costs, and decreasing the supply of and the demand for interstate products." H.R. Conf. Rep. No. 103–711, at 385, U.S.Code Cong. & Admin.News 1994, pp. 1803, 1853.
>
> Given these findings and petitioners' arguments, *the concern that we expressed in Lopez that Congress might use the Commerce Clause to completely obliterate the Constitution's distinction between national and local authority seems well founded.* The reasoning that petitioners advance seeks to follow the but-for causal chain from the initial occurrence of violent crime (the suppression of which has always been the prime object of the States' police power) to every attenuated effect upon interstate commerce. If accepted, petitioners'

reasoning would allow Congress to regulate any crime as long as the nationwide, aggregated impact of that crime has substantial effects on employment, production, transit, or consumption. Indeed, if Congress may regulate gender-motivated violence, it would be able to regulate murder or any other type of violence since gender-motivated violence, as a subset of all violent crime, is certain to have lesser economic impacts than the larger class of which it is a part.

*   *   *

We accordingly reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce. *The Constitution requires a distinction between what is truly national and what is truly local*. In recognizing this fact we preserve one of the few principles that has been consistent since the Clause was adopted. The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States. Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.

*Id.* at 614-18 (emphasis added; citations and footnotes omitted).

The Court pauses here to note an interesting point defendants make at pages 12-13 of their reply brief: The Supreme Court's decision in *Morrison*, which post-dated ratification of the ICCPR by eight years, did not mention that treaty as a possible basis for upholding the VAWA, although this argument was raised in a lengthy amicus brief that was filed with the Supreme Court by a group of international legal scholars and human rights experts. *See Brzonkala v. Morrison*, Nos. 99-0005, 99-0029 (S. Ct. 1999), Brief Amici Curiae on Behalf of International Law Scholars and Human Rights Experts in Support of Petitioners, available at https://cyber.harvard.edu/archived_content/events/vaw/readings/library/ILSHREamicuspet.html (last visited on Nov. 14, 2018).

In *Norton v. Ashcroft*, 298 F.3d 547 (6th Cir. 2002), plaintiffs were two anti-abortion

protesters who protested outside a Planned Parenthood clinic.  They were threatened with arrest under the Freedom of Access to Clinic Entrances Act, which prohibits the obstruction or intimidation of those seeking or providing reproductive health services.  Plaintiffs brought suit to challenge the constitutionality of the statute, including on Commerce Clause grounds.  In rejecting this challenge, the Sixth Circuit began by interpreting *Morrison* as identifying

> four relevant considerations: 1) the economic nature of the activity; 2) a jurisdictional element limiting the reach of the law to a discrete set of activities that has an explicit connection with, or effect on, interstate commerce; 3) express congressional findings regarding the regulated activity's effects on interstate commerce; and 4) the link between the regulated activity and interstate commerce.

*Id.* at 555-56.  Regarding the first factor, the Sixth Circuit found that the regulated activity – blocking access to abortion clinics – is commercial in nature because of its direct economic effect (causing clinics to close, delaying services, persuading some doctors not to provide services, etc.). Regarding the second factor, the Sixth Circuit noted that the statute lacked a "formal jurisdictional element," but it found this to be unimportant "[i]n light of the extensive congressional findings regarding the economically disruptive effects of clinic blockades and anti-abortion violence."  *Id.* at 557.  These findings, which are the third factor, were contained in extensive reports made by both Senate and House committees, and also covered the fourth factor, i.e., the link between the activity and interstate commerce.  For example, Congress found that there is a national commercial market for abortion services, that anti-abortion protests burden interstate commerce, that patients and physicians often travel interstate to obtain or provide abortion services, and that protests sometimes cause clinics to close and for some doctors to stop working in this field.  The Sixth Circuit concluded:

> In addition to the documented economic disruption of clinic

blockades and violent protests, Congress also found that this conduct was driven by a nationally unified and nationally coordinated anti-abortion movement. Congress found that many of these activities were organized and directed across state lines, and that the problem was increasingly beyond the scope of local and state authorities. H.R.Rep. No. 103–306, at 9, U.S.C.C.A.N., at 706.

Given the detailed congressional record, we are satisfied that Congress had a rational basis to conclude that the activities prohibited by the Act disrupted the national market for abortion-related services and decreased the availability of such services. Considered along with the other *Morrison* factors, we hold that Congress validly enacted the Act pursuant to its Commerce Clause power.

*Id.* at 559 (citation omitted).

In *Gonzales v. Raich*, 545 U.S. 1 (2005), plaintiffs were California residents who used marijuana for medical reasons, as allowed by that state's Compassionate Use Act. One of the plaintiffs grew her own marijuana plants, while the other received her marijuana free of charge from two caregivers. After the DEA confiscated plaintiffs' marijuana, plaintiffs sought an injunction prohibiting the United States from enforcing the Controlled Substances Act ("CSA") "to the extent it prevents them from possessing, obtaining, or manufacturing cannabis for their personal medical use." *Id.* at 7. The district court denied the injunction, but the Ninth Circuit reversed, finding that Congress could not regulate "the intrastate, noncommercial cultivation and possession of cannabis for personal medical purposes." *Id.* at 8.

The Supreme Court reversed. As in *Lopez* and *Morrison*, the Court began by noting that only the third category of Commerce Clause regulation was at issue, i.e., the "power to regulate activities that substantially affect interstate commerce." *Id.* at 17. The Court then rejected plaintiffs' argument, finding "striking similarities" with *Wickard*:

*Wickard* thus establishes that Congress can regulate purely intrastate

18

> activity that is not itself "commercial," in that it is not produced for sale, if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity.
>
> The similarities between this case and *Wickard* are striking. Like the farmer in *Wickard*, respondents are cultivating, for home consumption, a fungible commodity for which there is an established, albeit illegal, interstate market. . . . In both cases, the regulation is squarely within Congress' commerce power because production of the commodity meant for home consumption, be it wheat or marijuana, has a substantial effect on supply and demand in the national market for that commodity.[29]
>
> _____
>
> [29] To be sure, the wheat market is a lawful market that Congress sought to protect and stabilize, whereas the marijuana market is an unlawful market that Congress sought to eradicate. This difference, however, is of no constitutional import. It has long been settled that Congress' power to regulate commerce includes the power to prohibit commerce in a particular commodity.

*Id.* at 18-19 & n.29.  The Court rejected plaintiffs' argument that the statute could not be applied to them because Congress had not made any findings that their intrastate cultivation and possession of marijuana affected interstate commerce: "We need not determine whether respondents' activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding."  *Id.* at 22.  The Court noted that "Congress did make findings regarding the effects of intrastate drug activity on interstate commerce."  *Id.* at 21 n.32.  Further, "[g]iven the enforcement difficulties that attend distinguishing between marijuana cultivated locally and marijuana grown elsewhere, and concerns about diversion into illicit channels, we have no difficulty concluding that Congress had a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA."  *Id.* at 22 (citation and footnote omitted).  The Court went on to distinguish *Lopez* and *Morrison*:

> Unlike those at issue in *Lopez* and *Morrison*, the activities regulated by the CSA are quintessentially economic. "Economics" refers to

> "the production, distribution, and consumption of commodities."
> Webster's Third New International Dictionary 720 (1966). The CSA
> is a statute that regulates the production, distribution, and
> consumption of commodities for which there is an established, and
> lucrative, interstate market. Prohibiting the intrastate possession or
> manufacture of an article of commerce is a rational (and commonly
> utilized) means of regulating commerce in that product.

*Id.* at 25-26 (footnote omitted).

In *United States v. Chambers*, 441 F.3d 438 (6th Cir. 2006), defendant was convicted of possessing child pornography – Polaroid photos he had taken himself and kept at home. On appeal, he argued that the statute was unconstitutional as applied to him because his "homegrown" pornography had no effect on interstate commerce. The Sixth Circuit rejected this argument based on *Raich*, reasoning that both marijuana and child pornography are "fungible commodities" for which there is an interstate market. *Id.* at 455.

Finally, in *Taylor v. United States*, 136 S. Ct. 2074 (2016), defendant was convicted under the Hobbs Act of robbing two marijuana dealers in Virginia. That statute "makes it a crime for a person to affect commerce, or to attempt to do so, by robbery." *Id.* at 2077. In an effort to overturn his conviction, defendant argued that the government had not proven any effect on interstate commerce. The Court noted that the Commerce Clause permits Congress to regulate three categories of activity and, as in the other cases discussed above, it focused on the third category, i.e., those with a substantial effect on interstate commerce. The Court then reiterated the following statement from *Morrison*: "While this final category is broad, 'thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature.'" *Id.* at 2079-80 (quoting *Morrison*, 529 U.S. at 613). The Court went on to say that "the activity at issue, the sale of marijuana, is unquestionably an economic activity," and it

upheld the statute, and defendant's conviction, because

> [u]nder *Raich*, the market for marijuana, including its intrastate aspects, is "commerce over which the United States has jurisdiction." It therefore follows as a simple matter of logic that a robber who affects or attempts to affect even the intrastate sale of marijuana grown within the State affects or attempts to affect commerce over which the United States has jurisdiction.

*Id.* at 2080.

### 2. *Discussion*

In deciding whether Congress has used its legislative power permissibly under the Commerce Clause, the cases instruct to first evaluate the economic nature of the regulated activity. In the present case, the government has failed to show that FGM is a commercial activity. It claims that "[l]ike child pornography and marijuana, an interstate market exists for FGM." Gov't's Br. at 32. Yet the government's only evidence of such a market is the fact that it has alleged nine FGM victims in the present case, five of whom were brought to Michigan from neighboring states. *Id.* at 39. This is not a market, but a small number of alleged victims. If there is an interstate market for FGM, why is this the first time the government has ever brought charges under this 1996 statute?[7] The government's attempt to show that there is an interstate market for FGM falls flat; its comparison to the multi-billion-dollar interstate markets for marijuana and pornography is unsupported and unconvincing.

---

[7] The government indicates that there was one other FGM prosecution in 2005, in which the two defendants allegedly "offered to perform FGM on two minor girls for $8,000." Gov't's Br. at 41 n.33. However, this offer was to an undercover agent, not parents seeking this service, and the defendants pled guilty to child pornography charges. The government's only other argument for a commercial aspect of FGM is Senator Wellstone's comment in 1995 that the FGM statute would deter "medical professionals, some of whom reportedly have been offered as much as $3,000 to perform mutilations on young girls." *Id.* at 40 n.31. The government has offered no evidence of money changing hands for such mutilations.

The government also contends that FGM is "an illegal form of healthcare," and since Congress can regulate healthcare, it can regulate FGM. In an effort to show that FGM is a form of healthcare, the government points to the fact that two of the defendants are physicians, that the procedure was performed at a medical clinic, and that Dr. Nagarwala "used commercially-sold medical tools and supplies," including Valium, a "schedule VI controlled substance, federally regulated as a commercial product." *Id.* at 38. The comparison of FGM to healthcare is unsuitable. FGM is a form of physical assault, not anything approaching a healthcare service. The cases the government cites in this section of its brief dealt with abortion services and healthcare generally, *id.* at 37, which bear no resemblance to the crime of mutilating girls' genitalia.

The government further asserts that "like the legislation at issue in *Raich*, Congress has enacted a comprehensive regulatory regime to eradicate FGM." *Id.* at 33. The regulatory regime at issue in *Raich* is the Comprehensive Drug Abuse Prevention and Control Act and implementing regulations. This statute covers drug treatment (Title I), drug control and enforcement (Title II), and drug importation (Title III). Title II, which classifies a long list of drugs in one of five schedules, sets "strict requirements regarding registration, labeling and packaging, production quotas, drug security, and recordkeeping." *Raich*, 545 U.S. at 14. There is no comparable "regulatory regime" for FGM, but simply a ban on the practice. In *Raich*, the Supreme Court noted that "[e]conomics refers to the production, distribution, and consumption of commodities," and found that the CSA "regulates the production, distribution, and consumption of commodities for which there is an established, and lucrative, interstate market." *Id.* at 25-26. No such comparison can be made with FGM.

FGM cannot, by any stretch of the imagination, be classified as an economic or

commercial activity.  There is no suggestion that the procedure is done for money, aside from the unsupported comment made years ago by Senator Wellstone.  *See supra* note 7.  Nor is there any suggestion that this "service" is offered within anything approaching an established interstate market, as exists for illegal drugs and pornography.  Committing FGM is comparable to possessing a gun at school, i.e., a criminal act that "has nothing to do with commerce or any sort of economic enterprise."  *Lopez*, 514 U.S. at 561.  Nor can the Court distinguish FGM from gender-motivated crimes of violence, which the Supreme Court noted in *Morrison* "are not, in any sense of the phrase, economic activity."  529 U.S. at 613.  Even assuming that FGM is a wide-spread practice within the United States (a fact the government has not established), it cannot be as wide-spread as violence against women.  If, as the Supreme Court found in *Morrison*, rape and other forms of sexual assault against women are not economic or commercial activity, and therefore not part of an interstate market, no different conclusion can be reached concerning FGM, which is another form of gender-related violence.

The second factor the Court must consider is whether the statute contains "a jurisdictional element limiting the reach of the law to a discrete set of activities that has an explicit connection with, or effect on, interstate commerce."  *Norton*, 298 F.3d at 555-56.  There is no jurisdictional element in the FGM statute, which does not require any proof that the victims or the provider traveled in, or had any effect on, interstate commerce.

The cases indicate that the absence of a jurisdictional element is unimportant if there are sufficient congressional findings (third factor) or other evidence (fourth factor) of a substantial effect on interstate commerce.  In the present case, however, there are no congressional findings

other than the pro forma ones that accompanied passage of the statute.[8]  However, these are not

findings as much as unsupported conclusions, and they do not begin to compare with the extensive

findings made, for example, by both houses of Congress in *Norton*, *Raich*, and *Perez*.  Nor are these

the type of detailed, record-based findings that "would enable us to evaluate the legislative judgment

that the activity in question substantially affected interstate commerce, even though no such

substantial effect was visible to the naked eye."  *Lopez*, 514 U.S. at 563.

       The Court next comes to the fourth factor, "the link between the regulated activity

and interstate commerce," *Norton*, 298 F.3d at 556, i.e., whether there is a rational basis for finding

---

[8] These findings, which appear in the "historical and statutory notes" of § 116, state:

The Congress finds that:

(1) the practice of female genital mutilation is carried out by members of certain cultural and religious groups within the United States;

(2) the practice of [FGM] often results in the occurrence of physical and psychological health effects that harm the women involved;

(3) such mutilation infringes upon the guarantees of rights secured by Federal and State law, both statutory and constitutional;

(4) the unique circumstances surrounding the practice of [FGM] place it beyond the ability of any single State or local jurisdiction to control;

(5) the practice of [FGM] can be prohibited without abridging the exercise of any rights guaranteed under the first amendment to the Constitution or under any other law; and

(6) Congress has the affirmative power under section 8 of article I, the necessary and proper clause, section 5 of the fourteenth Amendment, as well as under the treaty clause, to the Constitution to enact such legislation.

that FGM has a substantial effect on interstate commerce.  Here the government's argument amounts to this:  there is a market for FGM, and even if defendants' activities have only a slight effect on that market, Congress can regulate it just as in *Wickard*, *Raich*, and *Chambers*.  That is, the government seems to concede that it cannot show that defendants, by performing FGM and/or aiding and abetting and/or conspiring to do so, had a substantial effect on interstate commerce.  But, the argument continues, because Congress can regulate the "market" for this service, it can also regulate defendants' activities in that market, regardless of how trivial their impact individually may be on the market as a whole.  For the reasons stated above, the Court rejects this argument.  There is no evidence that FGM is a commercial activity, and there is no evidence that anyone beyond the mothers of the nine girls alleged in the third superseding indictment is in the market for this "service."

Finally, the government asserts that only a federal statute can deal with FGM because, as Congress asserted in its fourth finding, "the unique circumstances surrounding the practice of female genital mutilation place it beyond the ability of any single State or local jurisdiction to control."  *See supra* note 8.  This argument fails for at least two reasons.  First, the Commerce Clause allows Congress to regulate commercial activity that has a substantial effect on interstate commerce, not activity that is "beyond the ability of any single State or local jurisdiction to control."  Second, the government informs the Court that twenty-seven states have passed FGM statutes, *see* Gov't's Ex. 20, and nothing prevents the others from doing so.  Further, counsel for the government argued during the December 5, 2017, hearing on defendants' motion to dismiss one of the counts of the second superseding indictment that FGM is criminal sexual conduct because it involves unlawful touching and penetration.  If that is correct, then FGM could already be

prosecuted in every state under existing criminal sexual conduct statutes, to say nothing of battery or child abuse statutes.  The government's suggestion that "those seeking the procedure [can] travel to refuge states where the practice is not prohibited" is simply false.  Gov't's Br. at 33, 43.  No state offers refuge to those who harm children.

### *Conclusion*

Having reviewed § 116(a) with the greatest possible deference, the Court concludes that it is unconstitutional.  Congress had no authority to pass this statute under either the Necessary and Proper Clause or the Commerce Clause.

The Necessary and Proper Clause does permit Congress to pass legislation to enforce treaty obligations, but there must be a rational relationship between the two.  In the present case, there is no such relationship between the ICCPR and the FGM statute.  Article 3 calls for "the equal right of men and women to the enjoyment of all civil and political rights set forth in the present Covenant," while Article 24 calls for protection of children without discrimination based on "race, colour, sex, language, religion, national or social origin, property or birth."   Neither article is rationally related to the FGM statute, which prohibits the mutilation of girls' genitalia.  Even if it could be argued that the statute rationally seeks to implement a provision of the ICCPR, Congress may not enact such a statute because, as the Supreme Court has stated, the federal government has no "plenary police power," *Lopez*, 514 U.S. at 566, and "the clearest example of traditional state authority is the punishment of local criminal activity."  *Bond*, 572 U.S. at 858.  Federalism concerns demand that this division of authority between the federal and state governments be respected.  No treaty – and no statute enacted to implement a treaty – may upset this balance.

Nor was enactment of the FGM statute a permissible exercise of congressional power

under the Commerce Clause.  That clause permits Congress to regulate activity that is commercial or economic in nature and that substantially affects interstate commerce either directly or as part of an interstate market that has such an effect.  The government has not shown that either prong is met.  There is nothing commercial or economic about FGM.  As despicable as this practice may be, it is essentially a criminal assault, just like the rape at issue in *Morrison*.  Nor has the government shown that FGM itself has any effect on interstate commerce or that a market exists for FGM beyond the mothers of the nine victims alleged in the third superseding indictment.  There is, in short, no rational basis to conclude that FGM has any effect, to say nothing of a substantial effect, on interstate commerce.  The present case cannot be distinguished from *Lopez* or *Morrison*.  As in those cases, FGM is a crime that could be prosecuted under state law.  FGM is not part of a larger market and it has no demonstrated effect on interstate commerce.  The Commerce Clause does not permit Congress to regulate a crime of this nature.

As the Supreme Court has stated, "[a] criminal act committed wholly within a State 'cannot be made an offence against the United States, unless it have some relation to the execution of a power of Congress, or to some matter within the jurisdiction of the United States.'" *Bond*, 572 U.S. at 854 (quoting *United States v. Fox*, 95 U.S. 670, 672 (1878)).  For the reasons stated above, the Court concludes that Congress had no authority to enact 18 U.S.C. § 116(a) under either grant of power on which the government relies.  Therefore, that statute is unconstitutional.  Accordingly,

IT IS ORDERED that defendants' motion to dismiss counts one through six of the third superseding indictment is granted.

s/Bernard A. Friedman
Dated:  November 20, 2018          BERNARD A. FRIEDMAN
Detroit, Michigan                 SENIOR UNITED STATES DISTRICT JUDGE

**CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on November 20, 2018.

s/Johnetta M. Curry-Williams
Case Manager